IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOY L. LITTLE,

       Plaintiff,

                                    Civil Action 2:14-cv-532
    v.                            JUDGE GREGORY L. FROST
                                    Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

**OPINION AND ORDER**

Plaintiff, Joy L. Little, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for

review of a final decision of Defendant, the Commissioner of Social Security

("Commissioner"), that denied her applications for social security disability insurance benefits

and supplemental security income. This matter is before the Court for consideration of

Plaintiff's statement of specific errors (ECF No. 11), the Commissioner's memorandum in

opposition (ECF No. 19), Plaintiff's reply memorandum (ECF No. 20), and the administrative

record (ECF No. 8). For the reasons that follow, the Court **OVERRULES** Plaintiff's statement

of specific errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

Plaintiff filed her applications for disability and supplemental security income benefits on

January 13, 2011, alleging that she has been disabled since February 11, 2010, at age 50. (R. at

170−77.) Plaintiff alleged disability due to diverticulitis, anxiety, depression, irritable bowel

syndrome ("IBS"), and a spasmodic colon. (R. at 188.) Plaintiff's application was denied

initially and upon reconsideration. (R. at 112−20, 122−28.) Plaintiff sought a *de novo* hearing

1

before an administrative law judge ("ALJ").  (R. at 129-30.)  The ALJ held a hearing on June 15, 2012, at which Plaintiff appeared with a "non-attorney representative."  (R. at 52-83.)  Vocational expert Barry Brown ("VE") also appeared and testified; he subsequently responded to interrogatories.  (R. at 77−82, 263−67.)  On February 1, 2013, the ALJ issued a decision finding that Plaintiff was not disabled.  (R at 13−23.)  The Appeals Council denied Plaintiff's request for review and adopted the ALJ's determination as final.  (R. at 1−6.)  Plaintiff then timely commenced this action.

## II.    PLAINTIFF'S TESTIMONY

Plaintiff testified that she is married and lives with her husband.  (R. at 58−59.)  She further testified that she has daily issues with IBS, that she experiences symptoms in the morning, and that it takes two hours before medication allows her to function.  (R. at 66−67.)  She also described the pain the IBS causes as follows: "[S]omebody is taking an ice pick and jabbing me under the belly button continuously . . . it's so painful it makes me vomit and then I'm vomiting every half hour until we get enough Phenergan in me . . . to stop the vomiting, and enough of the pain medication and muscle relaxers to calm me down."  (R. at 69.)  Plaintiff further stated that these episodes sometimes occur weekly, although in the months leading up to the hearing she had experienced pain without vomiting.  (R. at 70.)  She testified that when she has a bad or painful episode, she lays in a fetal position and that she may take as many as five Dilaudid.  (R. at 72.)

Plaintiff testified that she sometimes avoids drinking or eating so that she does not aggravate her symptoms because solid food causes her constipation and diarrhea.  (R. at 70−71.)  Plaintiff testified that her diarrhea has caused her to have "accidents" in stores.  (R. at 71.)  As a result, Plaintiff avoids going out so she does not have to call her husband and ask him to come get

2

her if she has an "accident" or a painful episode in public.  (R. at 71−72.)  She testified that she made such calls for assistance to her husband on several occasions and that he once found her on the blacktop behind a store at 2:00 a.m. in the morning, unable to drive.  (*Id.*)

Plaintiff also testified that she has problems with anxiety and depression.  (R. at 74.)  In response to questioning, she said that she attributes her anxiety directly to her IBS, but she does not think "a spasmodic colon has anything to do with depression."  (R. at 74.)

Plaintiff testified that she cooks supper or gets things ready for her husband to cook supper.  (R. at 67.)  Plaintiff also testified that she keeps her house presentable and does dishes and laundry with breaks because a pinched nerve causes pain when folding clothes.  (75.)  Plaintiff stated that she reads romance novels when she does not feel sick, that she has a dog that she takes outside, and that she gardens when her husband or someone she trusts is at home because her garden is close to the street.  (R. at 76−78.)  She also indicated that she goes grocery shopping with her husband and sometimes rides in the car with him when he goes to the auto parts store, although she does not get out when she accompanies him on such trips.  (R. at 77.)  Plaintiff further indicated that she drives two or three times a month.  (R. at 59.)  Plaintiff described using a computer to check her bank account (even though she is not proficient with email) and texting her kids (albeit infrequently because of their schedules).  (R. at 77−78.)  She also stated that she does not play as big a role in her grandkids' lives as she would like because she "can't trust [her] stomach" and she does not want her grandkids to see her "that way."  (R. at 78.)

### III.    MEDICAL RECORDS

**A.      Plaintiff's Physical Impairments**

**1.      Records from Treating Physician Dr. Garabis**

Plaintiff sought treatment from Dr. Garabis for several physical ailments, including IBS, from at least May of 2009 until June of 2012.  (R. at 297−330, 343−354.)  Dr. Garabis' notes indicate that although Plaintiff complained about abdominal pain, her IBS symptoms were relatively mild both before and after the alleged onset date of February 11, 2010.  For instance, in treatment notes from nearly every examination that took place before and after that date, Dr. Garabis wrote that Plaintiff's abdomen was "soft," was "non-tender" or had "no tenderness," and was "non-distended."  (R. at 330, 328, 326, 324, 322, 320, 316, 314, 313, 308, 307, 303, 297, 354, 352, 350, 348, 346, 344).  Dr. Garabis also frequently noted that Plaintiff exhibited no abdominal guarding.  (R. at 330, 326, 324, 322, 320, 318, 316, 314).  On December 6, 2010, shortly before the alleged onset date, Dr. Garabis wrote that Plaintiff had mild abdominal pain.  (R. at 311.)  Dr. Garbari recorded at several examinations that Plaintiff did not report experiencing the following conditions ("pertinent negatives"): abdominal pain, altered stool form, altered stool passage, weight loss, and vomiting.  (R. at 306, 300, 298.)

The notes also indicate that throughout this period, Dr. Garabis prescribed several medications for Plaintiff's IBS, including Colestid and Amitza.  (R. at 306, 304, 302, 300, 298, 296, 353, 351, 349, 347, 345).  On September 13, 2011, Plaintiff was examined by a Physician's Assistant ("PA") under Dr. Garabis' direction.  (R. at 351−52).  The treatment notes prepared by that PA and signed by Dr. Garabis state that Plaintiff's irritable bowel syndrome is "stable with medication."  (R. at 351.)

On June 12, 2012, Dr. Garabis partially completed a medical source statement form that

4

asked him about Plaintiff's conditions and physical and mental limitations.  (R. at 375−79.)  In response to a question asking his diagnoses, Dr. Garabis did not mention Plaintiff's IBS and wrote only that his diagnosis was anxiety and borderline agoraphobia.  (*Id.*)  Dr. Garabis also did not respond to questions asking him to opine about Plaintiff's ability to sit, stand, or walk during an eight hour workday; whether Plaintiff would need to take unscheduled breaks; how many pounds Plaintiff could lift or carry; how often Plaintiff could bend or twist during an eight hour workday; and whether Plaintiff's condition was likely to produce "good days" and "bad days." (R. at 377−78.)  Dr. Garabis did opine, however, that Plaintiff's pain or other symptoms are severe enough to constantly interfere with Plaintiff's attention and concentration.  (R. at 376.) He nevertheless failed to answer a question asking him to characterize the nature, location, frequency, precipitating factors, and severity of Plaintiff's pain.  (R. at 375.)

     **2.**       **Records from Examining Physician Dr. Ayesu-Offei**

On July 18, 2012, Dr. Ayesu-Offei examined Plaintiff and prepared an RFC.  (R. at 388−397.)  In it, he opined that Plaintiff can never lift or carry 21-100 pounds, can occasionally lift or carry 11 to 20 pounds, and can continuously lift or carry up to ten pounds.  (R. at 392.)  He further opined that Plaintiff can sit for 4 hours, stand for 1 hour, and walk for 2 hours without interruption, and that Plaintiff could stand or walk for a total of 4 hours in an eight-hour workday and could sit continuously.  (R. at 393.)  Dr. Ayesu-Offei also opined that Plaintiff can only reach overhead occasionally and that she can frequently reach in all other directions, and can continuously handle, finger, feel, and use foot controls.  (R. at 394.)  He further opined that Plaintiff can never climb ladders or scaffolds, but can occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, and he opined that she can continuously balance.  (*Id.*)  Dr. Ayesu-

Offei opined that Plaintiff can never tolerate exposure to unprotected heights and can occasionally tolerate moving parts, extreme cold, extreme heat, vibrations, and moderate noise. Dr. Ayesu-Offei also opined that Plaintiff can frequently tolerate humidity, wetness, dust, odors, fumes, and pulmonary irritants and that she can continuously operate a motor vehicle.  (R. at 396.)

In the July 20, 2012 narrative describing his examination, Dr. Ayesu-Offei wrote that Plaintiff indicated that she has a lot of problems with her IBS, which causes weight fluctuations and pain, and can be triggered by eating.  (R. at 398.)  Dr. Ayesu-Offei nevertheless noted that Plaintiff was not on a specialized diet and had not seen a gastroenterologist in over 8 years.  (*Id.*)  Plaintiff also told Dr. Ayesu-Offei that she has problems with depression, but denied having any panic episodes.  (*Id.*)  The notes indicate that Plaintiff said she has "a couple of friends" and "is able to do her own grocery and carry out simple activities of daily living independently."  (*Id.*)  Dr. Ayesu-Offei wrote that considering Plaintiff's history, presentation, and physical examination, Plaintiff should be able to maintain sedentary-type activity "without any problem at all."  (*Id.*)

**B.  Plaintiff's Mental Impairments**

**1.  Records from Treating Physician Dr. Garabis**

The records from Dr. Garabis also reflect treatment for mental health issues, including depression and anxiety, from at least November of 2009 until June of 2012.  (R. at 297−330, 343−54.)  Dr. Garabis' notes indicate that Plaintiff's depression and anxiety was relatively mild both before and after the alleged onset date of February 11, 2010.  For instance, in treatment notes from almost every examination, Dr. Garabis wrote that Plaintiff was alert and oriented to

6

person, place, and time ("alert and oriented times three") or "alert and oriented."  (R. at 326, 324, 318, 316, 314, 313, 309, 307, 305, 303, 301, 299, 354, 352, 350, 348, 346, 344.)  Of note, Dr. Garabis also wrote that Plaintiff exhibited "no unusual anxiety or evidence of depression" when he examined Plaintiff on January 3, 2011 and at every examination that took place after that.  (R. at 309, 307, 305, 303, 301, 299, 297, 354, 352, 350, 348, 346, 344.)  The notes also indicate that throughout this period, Dr. Garabis prescribed anxiety and mood disorder medications for Plaintiff including Celexa and Depakote.  (R. at 308, 306, 304, 302, 300, 298, 296, 353, 351, 349, 347, 345).  The September 13, 2011 treatment record prepared by a PA and signed by Dr. Garabis states that Plaintiff's anxiety is "well controlled with medication." (R. at 351.)

As noted above, in June 2012, Dr. Garabis partially completed a medical source statement form.  (R. at 375-79.)  In it, Dr. Garabis did not discuss Plaintiff's IBS, but stated that he had diagnosed Plaintiff with "severe anxiety and borderline agoraphobia."  (R. at 375.)  The document asked Dr. Garabis to identify his clinical findings and objective signs.  (R. at 375.)  In response, Dr. Garabis wrote: "anxious, flat affect, withdrawn."  (*Id.*)  Dr. Garabis opined that Plaintiff is not a malingerer, that her experience of pain or other symptoms is severe enough to constantly interfere with her attention and concentration, and that Plaintiff is severely limited in her ability to deal with work stress.  (*Id.*)  He also opined that Plaintiff "needs to be in a very limited environment in dealing with the general public."  (R. at 378.)

### 2. Records from Counselor Luftman

The records indicate that Plaintiff first sought services from Scioto Paint Valley Mental Health Center on March 25, 2010, approximately one month after her alleged onset date.  (R. at 280−85.)  The intake form that day, signed by counselor Luftman, indicates that Plaintiff

complained of anxiety, depression, and job-related problems that were moderate in severity.  (R. at 280.)  Although Plaintiff mentioned her IBS, she did not indicate any physical disabilities or disorders or any limitations with regard to her activities of daily living.  (R. at 281.)

The records indicate that Plaintiff did not seek services from Mr. Luftman again until March 2011 "because of a host of gastrointestinal problems," but that she regularly sought services after that until March 2012.  (R. at 342, 332−33.)  The records further indicate that Plaintiff consistently rated her depression levels as being at either a 3 or 4 and her anxiety levels as being a either a 4 or 5.  (R, at 342, 340, 339, 338, 337, 336, 335, 334, 333).  These same records state that Plaintiff's response to interventions was "favorable."  (*Id.*)  The records also reflect other signs of improvement.  For instance, on January 30, 2011, Mr. Luftman wrote that Plaintiff was more upbeat and brighter than normal because she was confident she would be awarded disability.  (R. at 334.)  On May 10, 2011, Mr. Luftman wrote that Plaintiff was "getting out more in terms of laundry, dog walking, gardening" and was considering "going to church and more ball games with grandchildren."  (R. at 340.)

On June 4, 2012, Mr. Luftman completed a psychiatric/psychological impairment questionnaire.  (R. at 401−08.)  In the questionnaire, Mr. Luftman indicated that he thought Plaintiff has marked limitations in 7 areas, moderate to marked limitations in 7 areas, moderate limitations in 3 areas, mild to moderate limitations in 2 areas, and mild limitations in 1 area.  (R. at 405−06.)  He also wrote that he believed that Plaintiff is incapable of tolerating even low work stress and would likely be absent more than 3 times a month as a result of her impairments or treatments.  (R. at 407−08.)

8

### 3.      Records from Examining Psychologist Dr. Donaldson

On April 26, 2011, psychologist Dr. Donaldson evaluated Plaintiff.  (R. at 292-95.)  Dr. Donaldson noted that Plaintiff appeared appropriately dressed and that her hygiene, grooming, and eye contact were adequate.  (R. at 293.)  Dr. Donaldson wrote that Plaintiff complained that she cries "at the drop of a hat,"  "can't stay up," has problems swallowing, has pain and vomiting, suffers from gastric distress, has trouble falling asleep, awakens during the night, and sometimes naps during the day.  (R. at 292−93.)  Plaintiff told Dr. Donaldson that she experiences feelings of guilt, hopelessness, helplessness, and worthlessness.  (R. at 294.)  The record reflects that she also reported experiencing anxiety about "the stupidest things," that she worried excessively "about everything," and that she experienced a panic attack five years prior to the examination.  (R. at 294.)  The notes state that Plaintiff's daily activities include caring for her dog, packing her husband's lunch, and sometimes cooking, cleaning, and doing laundry.  (R. at 295.)  Plaintiff stated that she lives with her husband and his cousin, has one friend, and likes to read.  (*Id.*)  Further, Plaintiff said that she grocery shops with help and drives to doctor appointments.  (*Id.*)  She also stated that she likes to spend time with her grandkids.  (R. at 294.)

Dr. Donaldson concluded that Plaintiff's ability to understand, remember, and carry out one- or two-step job instructions did not seem impaired.  (R. at 295.)  He did conclude the following: Plaintiff may be limited in the ability to perform repetitive tasks due to chronic pain; her level of motivation may be limited by her mood, anxiety, and provisional disorders; her ability to attend to relevant stimuli may be limited; and her interpersonal skills and ability to relate to supervisors and coworkers may be limited.  (*Id.*)  Last, Dr. Donaldson concluded that Plaintiff's ability to withstand stress and pressure associated with day-to-day work activity

9

appeared to be limited by the symptoms of mood, anxiety, and provisional disorders.  (*Id.*)  Dr. Donaldson did not, however, opine on the degree of any of the limitations he identified by indicating whether any of the limitations were mildly, moderately, or markedly severe.  (*Id.*)

### 4.    Records from Examining Psychologist Dr. Reese

On July 17, 2012, psychologist Dr. Reese examined Plaintiff.  (R. 380−87.)  Dr. Reese's notes indicate that Plaintiff was neat and clean and that her eye contact was good to inconsistent. (R. at 385.)  He further observed that Plaintiff exhibited no eccentric or impulsive behaviors or problems with speech or thought patterns.  (*Id.*)  He wrote, however, that her affect was constricted to agitated and that her prevailing mood was mildly to moderately anxious.  (*Id.*)  The records indicate Plaintiff told Dr. Reese that she is anxious most days, has crying spells, and gets depressed for no apparent reason.  (*Id.*)  Dr. Reese noted that Plaintiff described being anxious about medical issues and other worries and that she has five panic attacks a month, but denied staying home to avoid having such attacks in public.  (*Id.*)

The notes state that Plaintiff's daily activities include "fighting" her stomach issues with medications and caring for her dog.  (R. at 395.)  Although she does not participate in structured social activities, the notes indicate that Plaintiff socializes on weekends with her husband's cousin and his wife, with whom she plays cards, and that she has regular contact with a neighbor. (*Id.*)  The notes also state that Plaintiff cleans and cooks and that she and her husband both grocery shop.  (*Id.*)  Plaintiff indicated reading and gardening as hobbies.  (*Id.*)  Dr. Reese further noted that Plaintiff said that she has no problem with oral or written instructions in the workplace and that she is capable of repetitive work tasks.  (R. at 385.)  He also noted that she said she is not good at coping with stress on the job.  (*Id.*)

Dr. Reese opined that Plaintiff has no limitations with regard to the ability to carry out instructions.  (R. at 380.)  Dr. Reese also opined that Plaintiff has no limitations with regard to interacting appropriately with the public and supervisors.  (R. at 381.)  On the other hand, Dr. Reese indicated that Plaintiff is mildly restricted in her ability to interact appropriately with coworkers and in her ability to respond appropriately to usual work situations and to changes in a routine work setting, but that both of these limitations are mild.  (*Id.*)  He further opined that no other capabilities are affected by Plaintiff's impairments.  (*Id.*)

     **5.**     **State Agency Reviewers**

On March 31, 2011, a state agency doctor evaluated Plaintiff's file and concluded that Plaintiff is moderately limited in the ability to maintain concentration and attention for extended periods, in the ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and in the ability to respond appropriately to changes in the work setting.  (R. at 84−95.)  Moreover, the reviewer opined that due to Plaintiff's preoccupation with her symptoms, she might need a work environment without strict time limits or productivity requirements.  (R. at 93.)  This opinion was reviewed and adopted by a second state agency doctor on May 9, 2011.  (R. at 93, 95.)  On August 3, 2011, a state agency doctor reviewed Plaintiff's file again and identified the same limitations.  (R. at 96−108.)  That second review was subsequently reviewed and endorsed.  (R. at 108.)

     **IV.**     **VOCATIONAL EXPERT EVIDENCE**

In interrogatory responses dated October 19, 2012, the VE described Plaintiff's past relevant work.  (R. at 263.)  Specifically, he indicated that Plaintiff's past work as a kitchen

helper was medium, unskilled, but performed at light and medium levels; Plaintiff's past work as a hand packer was medium, unskilled, but performed at a heavy exertional level; Plaintiff's past work as a receptionist was sedentary, semi-skilled, but performed at a light exertional level; and Plaintiff's past work as a newspaper delivery driver was medium, semi-skilled.  (*Id.*)

The interrogatories also asked the VE to hypothesize an individual with Plaintiff's same profile but possessing the following restrictions: can carry 20 pounds occasionally and 10 pounds continuously; can sit 8 hours in an 8-hour day but no more than 4 hours at a time; can stand 4 hours in an 8-hour workday but no more than 1 hour at a time; can walk 4 hours in an 8-hour day, but no more than 2 hours at a time; can frequently reach in all directions, but can only occasionally reach overhead; can occasionally push and pull, climb stairs and ramps, stoop, kneel, crouch, and crawl; can frequently work around humidity and wetness, dust, fumes, odors, gases, and in poorly ventilated areas; can occasionally work around moving machinery, extremes of heat and cold, and vibration; can tolerate mild noise levels; cannot climb ladders ropes, scaffolds, or unprotected heights; can perform simple repetitive tasks that do not involve strict production quotas.  (R. at 264.)  The VE opined that such an individual would not be capable of performing her prior work, but that she could perform unskilled jobs that existed in the national and local economies in significant numbers.  (R. at 265−66.)  The VE gave examples of such jobs, including rental clerk, which is light, unskilled (with 500 regional, 3,500 state, and 50,000 nationwide positions); order clerk, which is sedentary, unskilled  (with 1,500 regional, 6,000 state, and 156,000 nationwide positions); and counter clerk, which is light unskilled (with 300 regional, 1,500 statewide, and 35,000 nationwide positions).

# V.    THE ADMINISTRATIVE DECISION

On January 24, 2013, the ALJ issued his decision.  (R. at 29-45.)  The ALJ found that

Plaintiff met the insured status requirement of the Social Security Act through September 30,

2015.  (R. at 29.)  At step one of the sequential evaluation process,[1] the ALJ determined that

Plaintiff had not engaged in substantially gainful activity since her alleged onset date of February

11, 2010.  (R. at 31.)  The ALJ also determined that Plaintiff has the following impairments that

are collectively severe: IBS, fibromyalgia, COPD, major depression, and an anxiety disorder not

otherwise specified.  (R. at 31.)  He further found that Plaintiff does not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments.  (R. at

31−32.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that [Plaintiff] can lift and
> carry 20 pounds occasionally and up to 10 pounds continuously; sit four hours at a
> time for a total of eight hours in an eight-hour day; stand one hour at a time for a
> total of four hours in an eight-hour day and walk two hours at a time for a total of
> four hours in an eight-hour day.  She is precluded from climbing ladders, ropes, or
> scaffolds, and working at unprotected heights.  She can reach overhead, push and
> pull, climb stairs and ramps, stoop, kneel, crouch and crawl occasionally and
> reach in all directions frequently.  She can also work around moving machinery,
> extremes of heat and cold and vibration occasionally; work around humidity and
> wetness, dust, fumes, odors, gases, and in poorly ventilated areas frequently and
> tolerate moderate noise levels.  Regarding mental limitations, [Plaintiff] retains

---

[1]   Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of
the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's
review, *see Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review
considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
> 2. Does the claimant suffer from one or more severe impairments?
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an
> impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant
> work?
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can
> the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279
F.3d 348, 354 (6th Cir. 2001).

the capacity to perform simple repetitive tasks that do not involve strict production quotas.

(R. at 35.)  In reaching this RFC, the ALJ assigned great weight to the opinion of examining psychologist Dr. Reese and examining physician Dr. Ayesu-Offei because they were generally consistent with the totality of the record evidence.  (R. at 37-39.)  The ALJ also assigned significant weigh to opinions from state agency reviewers with regard to Plaintiff's mental limitations because of their expertise and because their opinions were consistent and well supported by the record evidence.  (R. at 41.)

The ALJ nevertheless assigned no weight to the state agency reviewers' opinions with regard to Plaintiff's physical limitations because record evidence received after the review indicated more physical limitations than concluded by the reviewers at the time of their review. (R. at 40-41.)  The ALJ assigned some but not any great weight to examining psychologist Dr. Donaldson because the opinion was internally inconsistent, not well supported by the record, and was based to a great degree upon Plaintiff's subjective complaints, which the ALJ found not credible.  (R. at 36-37.)  The ALJ assigned little weight to the opinion of treating physician Dr. Garabis because he was not a specialist, his opinion was conclusory, his opinion was not consistent with his treatment notes and the totality of the record evidence, he relied upon Plaintiff's subjective and non-credible complaints when formulating his opinion, and his opinion failed to include a function-by-function assessment that would have otherwise made his opinion more convincing.  (R. at 37.)  Last, the ALJ assigned nominal weight to other source evidence from counselor Luftman because his opinion was not consistent with the totality of the record evidence and was based upon Plaintiff's subjective and non-credible complaints.  (R. at 40.)

At step four, relying upon evidence from the VE, the ALJ found that Plaintiff cannot

14

perform any of her past relevant work.  (R. at 46-47.)  The ALJ further concluded that considering Plaintiff's age, education, and work experience, there are jobs existing in significant numbers in the national and local economy that Plaintiff can perform.  (R. at 46−47.)

## VI.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.' " *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  Although the substantial evidence standard is deferential, it is not trivial.  The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, " 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error

15

prejudices a claimant on the merits or deprives the claimant of a substantial right.' " *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.    LEGAL ANALYSIS

Plaintiff raises several assignments of errors.  First, Plaintiff asserts that the ALJ erred by improperly assessing medical opinion and other evidence.  Second, Plaintiff asserts that RFC is deficient because it does not contain appropriate limitations.  These are addressed in turn.

### A.    The ALJ Assigned Proper Weight to Medical Opinion Evidence

Plaintiff contends that the ALJ erred when assessing and weighing opinions from treating physician Dr. Garabis and the state agency reviewers.  The Court finds that this contention lacks merit.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique prospective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. §416.927(d)(2). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the

16

claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight,

> an ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

17

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Regardless of the source of a medical opinion, the ALJ must apply the factors set forth in 20 C.F.R. § 416.927(c) in weighing the opinion, including the examining and treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source.  In addition, the regulations provide that where, as here, the ALJ does not assign controlling weight to the claimant's treating physician, the ALJ must explain the weight assigned to the opinions of the medical sources:

> Unless a treating source's opinion is given controlling weight, he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any other opinions from treating sources, non-treating sources, and other non-examining sources who do not work for us.

20 C.F.R. § 416.927(e)(2)(ii).  Where an ALJ's opinion satisfies the goal of § 416.927 and is otherwise supported by substantial evidence, the failure to explicitly provide the weight assigned is harmless. *See, e.g.*, *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 839 (6th Cir. 2005) (harmless error where the ALJ failed to mention or weigh the report of consultative neurologist who only evaluated plaintiff once and was not a treating source); *Dykes v. Barnhart*, 112 F. App'x 463, 467–69 (6th Cir. 2004) (failure to discuss or weigh opinion of consultative examiner was harmless error); *cf. Friend*, 375 F. App'x at 551 (explaining that the treating physician rule "is not a procrustean bed, requiring an arbitrary conformity at all times. If the

ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons
for the weight given a treating physician's opinion, strict compliance with the rule may
sometimes be excused.").

Finally, the Commissioner reserves the power to decide certain issues, such as a
claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will
consider opinions of treating physicians "on the nature and severity of your impairment(s),"
opinions on issues reserved to the Commissioner are generally not entitled to special
significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1.  Treating Physician Dr. Garabis

The Court concludes that the ALJ did not err by declining to assign controlling weight to
Dr. Garabis' opinion.  The ALJ acknowledged that Dr. Garabis was a treating physician, but
reasoned as follows:

> A treating source opinion is entitled to controlling weight where it is well
> supported by and not inconsistent with the objective medical record.  Here I find
> that the opinion regarding [Plaintiff's] mental residual functional capacity and
> limitations is not entitled to any special deference.  First, Dr. Garabis is a primary
> care physician, and does not appear to be a licensed psychiatrist or psychologist.
> Moreover there is nothing in the record to suggest any degree of specialization in
> psychiatry. As such, the opinion appears to rest at least in part on an assessment
> of impairments that lie outside the doctor's area of expertise. Moreover, the
> opinions expressed are quite conclusory, providing no objective explanation of
> the evidence relied on in forming that opinion. Additionally, Dr. Garabis'
> statement that [Plaintiff's] symptoms include anxiousness, fearfulness, and flat
> affect are wholly inconsistent with his own treatment notes that consistently note
> [Plaintiff] had failed to exhibit any unusual signs of anxiety or depression . . . . It
> appears that he doctor relied quite heavily on [Plaintiff's] subjective allegations.
> There are scant progress or treatment notes from the doctor or any other treating
> source that might otherwise support his opinion.  The totality of the evidence
> clearly illustrates that [Plaintiff] is not as mentally limited as indicated by this
> doctor.  Additionally, Dr. Garabis' assessment is largely incomplete as he failed
> to provide a function-by-function analysis of [Plaintiff's] mental limitations he
> had observed that might otherwise, and lacking specificity that might otherwise
> make it more convincing.  Finally, Dr. Garabis did not have access to all the

19

medical evidence that is currently in the record. Given the foregoing, Dr. Garabis opinion is entitled to little weight.

(R. at 37.)

The ALJ thus provided several good reasons for declining to give Dr. Garabi's opinion controlling weight. As Plaintiff correctly notes, it is inappropriate to reject a treating physician's opinion simply because he is not a specialist. Although specialization is a relevant consideration in determining the weight to assess to a treating source's opinion, "[a] treating physician's opinion on the mental state of his patient constitutes competent medical evidence even though the physician is not a certified psychiatrist." *Bushor v. Comm'r of Soc. Sec.*, No. 1:09–cv–320, 2010 WL 2262337, at *10 n.4 (S.D. Ohio Apr. 15, 2010).

The ALJ did not, however, rely on that reason alone. For example, the ALJ also stated that he discounted Dr. Garabis' opinion because it is inconsistent with other evidence, including Dr. Garabis' own treatment notes. *See Dawson v. Comm'r of Soc. Sec.*, 468 F. App'x 510, 513 (6th Cir. 2012) (finding that an ALJ properly discounted a treating physician's opinion in part because the physician's conclusions were inconsistent with his own progress notes); 20 C.F.R. § 404.1527(c)(4) (identifying consistency with the record as a whole as a relevant consideration when deciding the weight to give a medical opinion). The ALJ also stated that he discounted Dr. Garabis' opinion because it was conclusory and failed to specify Plaintiff's specific capabilities and limitations. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("the ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation' " (quoting *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984))); *see also* 20 C.F.R. § 404.1527(d)(3) (identifying "supportability" as a relevant consideration). The ALJ also discounted Dr. Garabis' opinion because he found it was heavily

20

based on Plaintiff's subjective complaints, which the ALJ found to be not entirely credible.  *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273-74 (6th Cir. 2010) (concluding that the ALJ did not err in rejecting a medical opinion based on the claimant's subjective complaints, which were not supported by objective medical evidence); *see also* 20 C.F.R. § 404.1527(d)(3).

Substantial evidence supports the ALJ's stated reasons for discounting Dr. Garabis' opinion.  For instance, substantial evidence supports the ALJ's determination that Dr. Garabis' opinion, which describes Plaintiff as being "anxious, fearful, flat affect," is inconsistent with Dr. Garabis' treatment notes, in which he repeatedly wrote that Plaintiff exhibited "no unusual anxiety or evidence of depression."  (R. at 309, 307, 305, 303, 301, 299, 297, 354, 352, 350, 348, 346, 344.)  Dr. Garabis' opinion is also inconsistent with a treatment note he signed that stated that Plaintiff's anxiety was "well controlled with medication." (R. at 351.)  Dr. Garabis' opinion conflicts with statements in Mr. Luftman's records indicating that Plaintiff consistently reported that her depression levels were only a 3 or 4 and that her anxiety levels were only a 4 or 5.  (R. at 342, 340, 339, 338, 337, 336, 335, 334, 333).  Dr. Garabis' opinion that Plaintiff had several extreme limitations also conflicts with Dr. Reese's opinion that Plaintiff had only mild limitations.  (R. at 375−76, 378.)

Substantial evidence also supports the ALJ's determination that Dr. Garabis's opinion was conclusory.  Dr. Garabis provided no objective support for his conclusions other than to say that Plaintiff was anxious, had a flat affect, and appeared withdrawn.  Nonetheless, Dr. Garabis does not indicate when he made such observations.  None of Dr. Garabis' treatment notes ever state that Plaintiff presented with flat affect or that she was withdrawn.  Rather, the

21

notes generally indicate that Plaintiff was alert and well oriented.  (R. at 326, 324, 318, 316, 314, 313, 309, 307, 305, 303, 301, 299, 354, 352, 350, 348, 346, 344.)

Substantial evidence additionally supports the ALJ's decision to discredit Dr. Garabis' opinion because it appeared to be based largely on Plaintiff's subjective complaints, which the ALJ held to be not credible.  When assessing Plaintiff's credibility, the ALJ explained that Plaintiff's activities of daily living are not consistent with disabling symptoms and limitations. The ALJ wrote:

> [Plaintiff] reported social and leisure activities to include spending time with friends and family, watching television, reading romance novels, fishing watching sports, cooking and playing cards and endorsed her ability to pay bills, count change,  handle a savings account and use a checkbook/money orders . . . . [Plaintiff] reported spending time with her grandchildren at her April 26, 2011 psychological evaluation.  She also indicated she cared for her dog, packed her husband's lunch, cooked, cleaned and did laundry at times . . . . May 10, 2011 counseling progress notes show she was considering going to church and spending more time with her grandchildren . . . . She reported being married to her husband for over 13 years, and described their relationship as going great during her July 17, 2012 evaluation.  [Plaintiff] also reported that she was responsible for the household cleaning and cooking and went shopping with her husband.  She also indicated she cared for a dog and spent time socializing and playing cards on weekends with her husband's cousin and wife.  She also reported her hobbies of gardening and reading.  It appears that [Plaintiff] lives a fairly full and somewhat active lifestyle which belies her allegations of severe and disabling impairments that prevent any and all work activity.

(R. at 45.)  The Court finds that substantial evidence supports the ALJ's credibility determination.  Plaintiff appears to have made inconsistent statements about her activities of daily living.  For example, in April 2011, Plaintiff told Dr. Donaldson that she grocery shopped with help.  (R. at 295.)  In July 2012, Plaintiff told Dr. Ayesu-Offei that she could do her own grocery shopping.  (R. at 398.)  Similarly, Plaintiff appears to have made inconsistent statements about her mental health symptoms.  On July 11, 2012, Plaintiff told Dr. Rees that

22

she has five panic attacks a month.  (R. at 385.)  Seven days later, Plaintiff denied having any "panic episodes" when evaluated by Dr. Ayesu-Offei on July 18, 2012.  (R. at 398.)

This Court finds that substantial evidence supports the ALJ's decision to assign less than controlling weight to Dr. Garabis' opinion.  The ALJ clearly considered the consistency and supportability of Dr. Garabis' opinion and reasonably found that lacking.

## 2.  State Agency Reviewing Physicians[2]

The Court further finds that the ALJ did not err when assigning great weight to the opinions of the state agency reviewing physicians with regard to Plaintiff's psychological impairments.[3]  Plaintiff asserts that in order for an opinion from a non-examining source to receive greater weight than an opinion from a treating source, the non-examining source should have access to a more complete case record or a specialist's report that offers the non-examining source more information than was available to the treating source.  In support of this contention, Plaintiff cites to Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *1 (Soc. Sec. Admin. July 2, 1996).  Plaintiff further asserts that the state agency reviewers did not have a fuller record than Dr. Garabis about Plaintiff's mental limitations because the ALJ indicated that although the reviewers' opinions about Plaintiff's physical limitations were correct at the time the reviews were done in 2011, the reviewers did not have the benefit of subsequent medical records documenting that Plaintiff had more physical limitations than the reviewers concluded.  (R. at

_____

[2]  Plaintiff does not challenge the weight assigned to the state agency examining physicians Dr. Donaldson, Dr. Reese, and Dr. Ayesu-Offei.  Her arguments are limited to challenging the weight given to the opinions from non-examining state agency consultants who reviewed her file.

[3]  The ALJ assigned no weight to the state agency reviewers' opinions regarding Plaintiff's physical impairments.  (R. at 40-41.)  Plaintiff does not challenge this determination.  The reviewers opined that Plaintiff had fewer physical limitations than the ALJ included in his RFC determination.

41.)  Thus, Plaintiff argues that the reviewers could not have had a fuller record in 2011 than Dr. Garabis had when he formulated his opinion in June 2012 and thus none of their opinions can be given greater weight than Dr. Garabis' opinion.

First, Plaintiff's interpretation of SSR 96-6p is flawed.  That rule provides that there will be occasions when an opinion from a non-examining source might be entitled to greater weight that an opinion from a treating source.  *Id*.  The rule then states that *an example* of when that can occur is when a state agency consultant has a fuller record than a treating or examining sources. *Id.*  The rule does not indicate that this is the only time that can occur.  Second, the ALJ complied with the relevant requirement.  That requirement, as noted above, is that when an ALJ does not assign controlling weight to a treating physician's opinion, the ALJ must explain the weight assigned to the opinions of other medical sources, including non-examining reviewers. 20 C.F.R. § 416.927(e)(2)(ii).

Here, the ALJ assigned great weight to the state agency reviewers' opinions regarding Plaintiff's mental limitations and sufficiently explained his rationale for doing so.  The ALJ explained that the state agency reviewing physicians possess expertise in developing limitations from an objective record and are conversant with disability program requirements.  (R. at 41.)  In addition, the ALJ explained that the reviewers' opinions with regard to Plaintiff's mental impairments were consistent and well supported by the record as whole.  (*Id.*)  Last, the ALJ explained that none of the evidence related to Plaintiff's mental impairment received after the review contained new or material information that would have impacted the reviewers' assessment of Plaintiff's mental limitations.  (*Id.*)  The ALJ discussed that subsequent evidence in great detail throughout his written determination.

24

This is not an instance where an ALJ relied upon a state agency reviewer's opinion without reviewing subsequent record evidence.  Rather, this is an instance where the ALJ explicitly assessed state agency reviewer's opinions in light of subsequent record evidence and found that because of that subsequent evidence, the reviewers' opinions about Plaintiff's physical impairments were entitled to no weight while the opinions regarding Plaintiff's mental impairments were entitled to great weight.

The Court concludes that substantial evidence supports this determination.  In 2011, the state agency reviewers opined that Plaintiff retains the mental capacity to concentrate and persist at simple tasks in a work environment without strict time or productivity requirement.  (R. at 92−93.)  That assessment is consistent with other subsequent record evidence suggesting that Plaintiff's mental restrictions are only mild including, for example, the July 17, 2012 opinion from evaluating psychologist Dr. Rees.  (R. at 381, 384−85.)  The Court concludes that this assignment of error is without merit.

### B.      The ALJ Properly Weighed Other Source Evidence from Counselor Luftman

The Court likewise concludes that the ALJ did not err when assigning minimal weight to the opinion of Plaintiff's counselor, Mr. Luftman.  Mr. Luftman does not qualify as a treating source because the relevant regulations do not define mental health counselors as treating sources.  *See Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (citing 20 C.F.R §§ 404.1502 and 404.1513(a)).  Thus, Mr. Luftman's opinions are not entitled to any particular weight.  *See* 20 C.F.R §§ 404.1513(a), 416913(a), (d).  Mr. Luftman is, instead, a valid "other source" whose opinion is entitled to consideration in conformity with the requirements of SSR 06−3p. Soc Sec.

Rul. No. 06–3p, 2006 WL 2329939, at *3 (Soc. Sec. Admin. Aug.9, 2006).

SSR 06–3p provides that opinions from other sources "are important and should be evaluated on key issues such as impairment or severity and functional effects." *Id.* SSR 06–3p further provides that an ALJ should generally evaluate these opinions under the regulatory factors used to analyze opinions from treating sources. *Id.* at *4. Not every factor will, however, apply in every case. *Id.* An ALJ is not presumptively required to assign controlling weight to opinions from other sources. *Id.* Importantly, an ALJ is only required to discuss other source opinions in enough detail to allow a claimant or subsequent reviewer to follow the ALJ's reasoning when an other source opinion impacts a determination or is given more weight than an opinion from a treating source. *Id.*

Here, Mr. Luftman's opinion did not impact the ALJ's determination. Nor did it receive greater weight than an opinion from a treating source. Nonetheless, the ALJ stated that he specifically considered Mr. Luftman's opinions when he assessed Plaintiff's RFC. (R. at 40.) The ALJ also recited and described Mr. Luftman' opinion at length but concluded that it was inconsistent with the record evidence as a whole including documents from Plaintiff's treating physician, Dr. Garabis. (*Id.*) The ALJ also noted that Mr. Luftman's opinions appeared to be based upon Plaintiff's subjective complaints, which the ALJ did not find credible. (*Id.*)

The ALJ's discussion is adequate in this case. It illustrates that the ALJ specifically considered two of the regulatory factors, consistency and supportability, and found them lacking. Substantial evidence supports that determination. The opinion posited several marked metal limitations even though the there is substantial record evidence to support that Plaintiff had only mild mental limitations. Accordingly, the Court concludes that ALJ did not err when assigning

minimal weight to Mr. Luftman's other source opinion.

### C.     The RFC Determination is not Deficient

Plaintiff also challenges the RFC. Specifically, Plaintiff contends that the RFC is deficient because it does not adequately address Plaintiff's limitations with regard to social functioning, stress tolerance, and her IBS symptoms.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). In formulating an RFC, an ALJ is only required to incorporate those limitations he or she finds credible. *See, e.g.*, *Irvin v. Soc. Sec. Admin.*, 573 F. App'x 498, 502 (6th Cir. 2014) ("Because the ALJ found that [the medical source's] assessment of [the claimant's] limitations was not credible, he was not required to incorporate the limitations assessed by her into his RFC determination." (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in a claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

### 1.      Mental Limitations – Social Functioning and Stress Tolerance

Plaintiff contends that the ALJ's RFC was deficient because it did not contain limitations that adequately address her difficulties with social functioning.  In support, Plaintiff points out that medical opinions in the record, including the opinion from Dr. Reese that was given great weight, conclude that Plaintiff has limitations with regard to social functioning.  (*Id.*)  Dr. Reese, however, opined that Plaintiff had only mild limitations with regard to interpersonal relationships.  (R. at 386, 381.)  Specifically, Dr. Reese opined that Plaintiff had "mild limitations" with regard to her ability to "[i]nteract appropriately with coworkers" but had no limitations with regard to her ability to interact with the public or supervisors.  (R. at 381.)

The ALJ evaluated Dr. Reese's opinion, found it consistent with the record evidence, and gave it great weight.  Moreover, at step two, the ALJ found that Plaintiff has only mild difficulties with social functioning.  The ALJ reasoned:

> [Plaintiff] has endorsed problems with anxiety, panic attacks and depression. However, She has reported socializing and playing cards with her husband's relatives. She also indicated that she enjoyed spending time with her grandchildren . . . . Moreover, the evidence in the record, including the testimony of [Plaintiff] at the hearing, shows that [Plaintiff] has relatively minor difficulty in interacting independently, appropriately, effectively, and on a sustained basis with other individuals. She presented at the hearing with no observable social difficulty, was polite and cooperative and did not display any problems interacting with the other participants and or in answering questions. The reviewing BDD psychologist[4] found that [Plaintiff] had mild restriction in social functioning . . . . There is no credible or convincing evidence since the date of that determination to support any greater restriction.

(R. at 34.)  In finding that Plaintiff's social functioning limitation are mild, the ALJ determined that findings of more severe limitations in this domain by others, including Dr. Garabis  and Mr.

---

[4]  The ALJ referenced the "reviewing BDD psychologist" and cited "Exhibit 4/F7," but appears to have been citing Exhibit 8F/7, which is page 7 of Dr. Reese's opinion.

Luftman, were not credible.  Thus, the ALJ permissibly declined to include social functioning limitations in the RFC.

Plaintiff also asserts that the RFC was deficient because it did not include limitations that specifically addressed her difficulties with stress tolerance.  In support, Plaintiff again asserts that medical opinions, including the opinion from Dr. Reese, concluded that Plaintiff had limitations with regard to stress tolerance.  But Dr. Reese opined that Plaintiff has only mild limitations with regard to "stress tolerance" and the ability to "respond appropriately to usual workplace situations and changes in routines."  (R. at 386, 381.)  The ALJ adopted this opinion with regard to stress tolerance by assigning Dr. Reese's opinion great weight.  The ALJ nevertheless limited Plaintiff to performing "simple repetitive tasks that do not involve strict production quotas."  (R. at 35.)  This more than adequately addressed Plaintiff's limitations with regard to stress tolerance because a low-stress environment is typically "defined as one free of fast-paced production or quota requirement."  *See, e.g., Huffman v. Astrue*, No. 2:10-CV-031, 2011 WL 1002096, *5 (S.D. Ohio Jan. 24, 2011), *adopted and affirmed* 2011 WL 1002721 (S.D. Ohio Mar. 17, 2011).

### 2.    Physical Limitations - IBS Symptoms

Last, Plaintiff asserts that the RFC is deficient because it failed to address Plaintiff's IBS.  Plaintiff argues that the ALJ was required to include such restrictions in the RFC because he found that Plaintiff's IBS constituted a severe impairment at step two.

It is important to note that a finding of a "severe" impairment at step two does not carry the same meaning as it otherwise would in ordinary parlance.  *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir.2007).  As defined by Social Security regulations, a

29

"severe" impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Courts, however, liberally construe the phrase "significantly limits" in favor of claimants.  *Griffeth*, 217 F. App'x at 428.  If the Commissioner rates the degree of limitation as none or mild, then the Commissioner will generally conclude that the impairment is not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d).  Therefore, step two of the sequential analysis is the means by which the Commissioner screens out totally groundless claims.  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).  To that end, the Sixth Circuit has deemed step two to be nothing more than a "*de minimis* hurdle."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) (citations omitted).  Moreover, "[a] claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other."  *Griffeth*, 217 F. App'x at 429.

In this case, the ALJ included in the RFC all of the physical limitations found in Dr. Ayesu-Offei's July 20, 2012 opinion, which the ALJ assigned some weight.  (R. at 38-39.) Specifically, the ALJ included the limitations to lifting, carrying, sitting, standing, walking, climbing, pushing and pulling, stooping, kneeling, crouching, and crawling, as well as the exposure limitations that were in in Dr. Ayesu-Offei's opinion.  (R. at 35, 388−99.)  No other medical source opined on how any of Plaintiff's physical limitations impacted Plaintiff's work-related functioning.  Accordingly, the physical limitations identified by Dr. Ayesu-Offei were uncontroverted, and the ALJ did not err by including them in the RFC.  The ALJ was not obligated, however, to include any additional limitations that specifically addressed Plaintiff's

30

IBS simply because he determined that her IBS was a severe condition at step two. *Griffeth*, 217 F. App'x at 429. The Court thus concludes that the ALJ did not err by failing to include additional physical limitations in the RFC.

### VIII.   CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, this Court **OVERRULES** Plaintiff's statement of errors and **AFFIRMS** the Commissioner's decision. The Clerk shall enter judgment accordingly and terminate this case on the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

_____/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE